THE SCHOOL COMMISSIONERS OF WICOMICO COUNTY
vs. THE SCHOOL COMMISSIONERS OF WORCESTER
COUNTY.

*Quasi Corporation created by bestowing powers on
Boards of School Commissioners—Rights and lia-
bilities of Counties out of which new Counties are
formed.*

The Act of 1868, ch. 407, transferred and vested in Boards of School Com-
missioners of the several counties and their successors, all the property,
money, and funds of every sort existing for the use and benefit of the
public schools of the several counties; and charged them with the duty
of administering and supervising the affairs of the public schools in their
respective counties; but did not, in terms, incorporate these Boards.
HELD:

That while not incorporated as legal entities in the full sense of the term,
these Boards were *quasi* corporations, with full power to sue and liable
to be sued, in respect to all matters within the scope of their duties and
obligations.

If a part of the territory and inhabitants of a county or town, are sepa-
rated from it by annexation to another, or by the creation of a new
county, the remaining part of the county or town retains all its prop-
erty, powers, rights and privileges, and remains subject to all its obliga-
tions and duties; unless some express provision be made by the Act
authorizing the separation.

The Legislature of Maryland, by several Acts, (1812, ch. 79; 1813, ch.
122; 1817, chs. 16 and 93,) made provision to raise a fund for school
purposes. This fund was subsequently divided among the several coun-
ties equally, without reference to inequality of territory or population.
(1816, *ch.* 256; 1817, *chs.* 16 *and* 93; *Code, Art.* 84, *sec.* 6.) After the
division, the proportion of each county was controlled by the officers of
the county under local laws; and was recognized as the separate prop-
erty of the county by the Acts of 1865, 1868, 1870, providing for a
general system of education in the State. Article 13 of the Constitution
of 1867, erected the county of Wicomico out of portions of the counties
of Somerset and Worcester, and provided that on the creation of the
new county, "the inhabitants thereof shall cease to have any claim to,
or interest in the county buildings and other public property of every
description, belonging to said counties of Somerset and Worcester, re-

spectively." On a bill filed by the School Commissioners of Wicomico against the School Commissioners of Worcester county, praying an account and a decree for such proportion of the aforesaid fund as was justly due those of the inhabitants of Wicomico county, who were formerly inhabitants of Worcester county, HELD:

1st. That neither the new county nor that part of it which was formerly part of Worcester county, is entitled to a division of the fund.

2d. That a Court of Equity has no power or jurisdiction over the subject-matter, that power being in the Legislature alone.

APPEAL from the Circuit Court for Worcester County, in Equity.

The facts are given in the opinion of the Court.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, BRENT, GRASON, ALVEY and ROBINSON, J.

*Isaac D. Jones,* for the appellants.

*J. H. Handy* and *T. A. Spence,* for the appellees.

ALVEY, J., delivered the opinion of the Court.

The Board of County School Commissioners of Wicomico County, as constituted under the Act of 1868, ch. 407, filed the present bill against the Board of County School Commissioners of Worcester County, as constituted under the same law, for an account and division of the school fund of the latter county; and the first question that naturally presents itself, under the demurrer of the defendants to the complainants' bill, is, whether the proper parties, either complainants or defendants, are now in Court to represent the subject-matter in controversy, according to the theory upon which the bill is framed?

Since the filing of the bill in this case, the Act of 1868, ch. 407, has been repealed and displaced by the Act of 1870, ch. 311. The Act of 1868 did not, in terms, incorporate the Boards of County School Commissioners for the several coun-

ties; but all the property, money and funds of every sort existing for the use and benefit of the public schools in the several counties, were transferred to and vested in such boards, and their successors in office, and they were charged with the duty of administering and supervising the affairs of the public schools in their respective counties. They were, therefore, while not incorporated as legal entities in the full sense of the term, *quasi* corporations, with full power to sue and liable to be sued, in respect to all matters within the scope of their duties and obligations. This results as well from the objects and purposes of such bodies, as the mode and manner of their organization. *O'Neal vs. School Commissioners of Washington Co.,* 27 *Md.,* 227; *Levy Court vs. Coroner,* 2 *Wall.,* 501. The Act of 1870, however, by express provision, incorporated the present Boards of School Commissioners in the several counties, and clothed them with full corporate powers, with respect to their office and duties. This Act, while it repealed the Act of 1868, contains no saving as to pending suits, and makes no reference whatever to the mode and manner of succession of the present to the former boards, except to declare that all the property, money, funds and State donations then by law vested in the public school authorities of any county, for the use and benefit of the public schools, should be transferred to and vested in the Board of County School Commissioners, and their successors in office. Whether, then, upon the repeal of the Act of 1868, this suit did not abate, and, in order to its further prosecution, it did not require new parties to be made, would be, if it were necessary to decide it, a question of some doubt and difficulty. But, with the opinion entertained by this Court in regard to the main question involved, the question as to the technical parties to the record is of small importance. For the purposes of the case, we will assume that the present Boards of School Commissioners of the two counties are parties to the record; and, upon that assumption, we shall proceed to the main and direct question intended to be raised by the bill for decision.

The school fund, of which account and division are claimed, had its origin in the Acts of 1812, ch. 79, and 1813, ch. 122, providing for the extension of certain bank charters. By the latter Act, every incorporated bank in the State was required, annually, to pay into the treasury of the State, the sum of twenty cents on every hundred dollars of the capital stock of each bank actually paid in, as a condition upon which its charter was extended; and by the 9th section of the Act, the treasurer of the State was required to invest the money received from the banks in stock, and to keep a separate account thereof, to be denominated a fund for the establishment of free schools; and, by the 10th section, the fund, thus created, was inviolably pledged for the establishment of a general system of free schools throughout the State, to be used or appropriated for no other purpose whatsoever, and which should be *equally divided among the several counties of the State.* By the Act of 1816, ch. 256, provision was made for distributing this fund to the several counties. Commissioners were appointed for each county, and the treasurer was directed to pay to such commissioners the county's legal proportion of the fund. Then came the Acts of 1817, chs. 16 and 93, incorporating certain other banks, in which were similar provisions to those in the Act of 1813, in reference to the amount to be paid into the treasury of the State, and the purposes to which such fund was to be applied. In each and all of these'Acts the fund provided for is declared to be for the establishment and support of free schools in the several counties, and the division directed was to be among the several counties equally, without reference to their inequality of territory or population. The money received from these sources was paid over to the counties accordingly, and it has been mainly from the money thus paid over to the counties that their present school funds have accumulated. Each county has controlled and administered its fund without reference to the manner in which other counties had administered and applied theirs. In some of the counties, the fund

has been variously administered; sometimes by school commissioners or trustees; at other times by the Levy Courts or county commissioners. From the time of the distribution to the counties, the funds became the subject of local legislation exclusively, until the enactment of the general school system of 1865; and in all such local legislation upon the subject these county funds have been treated and dealt with, not as matter subject to general State supervision, but as exclusively pertaining to and concerning the counties in their public political capacity. The several Acts of 1813, 1816, and 1817, before referred to, make distinct appropriation, apportionment and distribution of these funds to and among the several counties, and it would be contrary to all previous understanding if it were now held that these funds were not the public property of the several counties in which they have accumulated. They have been so treated and regarded by both the counties and the State at large. Hence, in the adoption of the Code, (1 vol., Art. 84, sec. 6,) the treasurer was directed to pay, as theretofore, to each of the counties and the city of Baltimore the proportion of the free school fund to which such county or city was entitled, under the provisions of the laws and resolutions existing at that time, and that such payment should be made to any person authorized to receive such proportion of the fund by the local laws of the several counties and the city of Baltimore. The Acts of 1865, 1868 and 1870, providing for a general system of education in the State, treat the county school funds as separate and distinct from the revenue to be raised by general or local taxation, and clearly recognize them as belonging to the several counties in their separate corporate capacities. Indeed, the theory upon which the present claim is based, is wholly at variance with the principle upon which the apportionment and distribution of the funds were originally made.

It is certainly true, in one sense, that, as the county of Worcester is an integral part of the State, established for public political purposes connected with the administration of

the State government, the property that she may hold in that character is subject to be governed and controlled by the State, and may be said to belong to the State. But this is true only in a qualified sense. The money that the county has received by the State's appropriation belongs to her as public property, to be applied exclusively to the purpose for which it was appropriated, and in promotion of the policy for which the fund was created. The inhabitants of the county have no individual interest in the money thus appropriated by the State. The State may control it by legislation; indeed, it would be entirely competent to the State to withdraw the appropriation altogether and apply the money to other purposes. But in the absence of legislation having for its object such change and re-direction of the fund made up of the money heretofore appropriated by the State, that fund remains the public property of the county, and which is held by her in her political corporate capacity; and, in that capacity, she still holds it, although it is now administered under the regulations of a general system applicable to the whole State.

Such then being the relation of Worcester county to the fund in controversy, what effect was produced upon this relation by the separation from that county of that part of it which now, together with what was formerly a part of Somerset county, form the new county of Wicomico, as authorized by the 13th Article of the Constitution of 1867? Did that separation entitle the new county, or that part of it which was formerly a part of Worcester county, to a division of the fund? We think not, and for most obvious reasons.

Upon general principles of law, as well as upon the reason of the thing, if a part of the territory and inhabitants of a county or town are separated from it, by annexation to another, or by the creation of a new county, as in the present instance, the remaining part of the county, or town, retains all its property, powers, rights and privileges, and remains subject to all its obligations and duties; unless some express provision

be made by the act authorizing the separation. This is a well established principle. *Windham vs. Portland*, 4 *Mass.*, 384 ; *County of Hampshire vs. County of Franklin*, 16 *Mass.*, 76, 86. If, therefore, the constitution had made no provision in reference to the rights and obligations of these counties, it is clear that no such claim as that now presented could be maintained. But the constitution is not silent upon the subject. It expressly provides that, upon the creation of the new county, " the inhabitants thereof shall cease to have any claim to, or interest in the county buildings, *and other public property of every description*, belonging to said counties of Somerset and Worcester, respectively." By electing to form part of the new county, the inhabitants so electing renounced all benefit of the public property of the county from which they separated. This was the express condition of the separation. And as the school fund in controversy is part of that public property, it follows that the claim made by the bill in this case is wholly unfounded.

Suppose, however, it was conceded that the theory of the complainants be correct as to the relation of the State and county to this particular fund ; still we do not perceive upon what principle a Court of Equity could afford the relief sought by the bill. There are many reasons why such relief could not be granted, but there is one that is conclusive beyond question, and that is that the Court has no such power or jurisdiction over the subject matter as that prayed to be exercised by it. That power is with the Legislature, and the Legislature alone.

The decree appealed from, sustaining the demurrer, and dismissing the bill, will be affirmed, but without costs.

*Decree affirmed.*